# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PHYLLIS G. WAGNER,        )
                           )
          Plaintiff,       )
                           )     **MEMORANDUM OPINION**
    v.                         )     **AND RECOMMENDATION**
                           )
                           )
MICHAEL J. ASTRUE,[1]      )         1:03CV1198
Commissioner of Social Security,   )
                           )
          Defendant.    )

Plaintiff, Phyllis G. Wagner, brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for a period of disability and Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Social Security Act (the "Act"). The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

---

[1] Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he should be substituted for Jo Anne Barnhart as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Procedural History**

Plaintiff filed an application for Supplemental Security Income (SSI)[2] on December 1, 2000 (protective filing date, August 8, 2000), with an alleged onset of disability (AOD) of May 10, 1994.[3] <u>See</u> Tr. 68, 69. The application was denied initially and upon reconsideration. Tr. 46, 47. Plaintiff requested a hearing de novo before an Administrative Law Judge (ALJ), Tr. 58, duly held on May 2, 2002,[4] <u>see</u> Tr. 25.

The ALJ did not find that Plaintiff was disabled for purposes of Act, Tr. 10, and Plaintiff requested review of that decision, Tr. 9. After the Appeals Council declined review, Tr. 4, Plaintiff filed the instant action in this court, Tr. 362. Defendant requested remand of the case for reconsideration by the ALJ and for the taking of additional evidence, if necessary. Def.'s Rem. Mot. (Pldg. #6). On March 11, 2004, with Plaintiff's consent, the court ordered remand for further administrative proceedings. Tr. 376.

---

[2]    According to the decision being challenged herein, Plaintiff also filed an application for Disability Insurance Benefits in 2000, <u>see</u> Tr. 327, but there is no such application, or associated documents, in the transcript.

[3]    The decision notes that Plaintiff previously filed an SSI application in 1994 which was denied at the initial level and was not eligible to be re-opened with Plaintiff's subsequent applications. Tr. 328.

[4]    The hearing transcript mistakenly dates the hearing in 2003.

2

On April 22, 2003, Plaintiff filed a Disability Insurance Benefits (DIB) application[5] and a second SSI application (protective filing date, March 17, 2003), both carrying an AOD of May 10, 1994. Tr. 437-42. After these applications were denied, see Tr. 361, 375, the ALJ conducted a hearing on the consolidated applications, Tr. 820. By decision dated January 24, 2006, the ALJ again determined that Plaintiff was not disabled. Tr. 324. On September 12, 2007, the Appeals Council denied Plaintiff's request for review, Tr. 317, thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through December 31, 1998.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant's (1) borderline intellectual functioning; (2) anxiety related disorder; (3) major depression; (4) somatoform disorder; (5) personality disorder; (6) degenerative disc disease of lumbar spine; (7) atonic bladder; (8) COPD/bronchitis; (9) history of alcohol and drug abuse are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

---

[5]    This application is not referenced in the challenged decision.

3

4.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The claimant has the following residual functional capacity:  light level work with occasional bending at the waist, crouching, kneeling, crawling, balancing, climbing; avoid exposure to vibration; avoid intense, ongoing interpersonal interaction with others; she can do simple, routine, repetitive tasks (i.e., unskilled work), but is unable to work at a production rate involving piece work (work stress=production).  Also, it should be noted that the claimant has to catheterize herself every other day due to bladder problems.

7.   The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8.   The claimant is an "individual closely approaching advanced age" (20 CFR §§ 404.1563 and 416.963).

9.   The claimant has "a limited education" (20 CFR §§ 404.1564 and 416.964).

10.  The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11.  The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12.  Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.11 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a garment bagger (DOT 920.687-018), light, SVP-1; pillow cleaner (DOT 789.687-122), light, SVP-1 and base filler (toy industry), light, SVP-1, with 19,000 such jobs in North Carolina and 3 million nationally.

4

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

Tr. 342-43.

## Analysis

In her brief before the court, Plaintiff argues that the Commissioner's findings are in error because the ALJ committed the following reversible errors:

(1) the ALJ failed to properly evaluate the opinion of her treating physician;

(2) substantial evidence does not support the ALJ's assessment of the consultant's opinion;

(3) the ALJ's hypothetical to the vocational expert (VE) did not accurately reflect Plaintiff's mental limitations;

(4) the ALJ's credibility assessment is flawed;

(5) the ALJ erred in her formulation of Plaintiff's residual functional capacity (RFC);

(6) because of the ALJ's above errors, she failed to find that Plaintiff met a "listing."

The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

5

Scope of Review

The Act provides that, for "eligible"[6] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).[7]

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration ("SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must determine whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Act's listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing any other work. Section 404.1520.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by

---

[6]    Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for SSI at 42 U.S.C. § 1382(a).

[7]    The regulations applying these sections are contained in different parts of Title 20 of the Code of Federal Regulations (C.F.R.). Part 404 applies to federal old-age, survivors, and disability insurance, and Part 416 applies to supplemental security income for the aged, blind, and disabled. Since the relevant portions of the two sets of regulations are essentially identical, the citations in this report will be limited to those found in Part 404.

6

substantial evidence and whether the correct law was applied. Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Pertinent Evidence Presented

As of the date of the ALJ's decision, Plaintiff was fifty-one years of age. Tr. 328. The ALJ found that she has a ninth grade education and past relevant work as a knitter. According to the ALJ, Plaintiff initially alleged disability as of May 10, 1994, due to bladder problems, back and knee problems, and mental problems.

7

The ALJ decided that Plaintiff had not engaged in substantial gainful activity (SGA) since her AOD. Tr. 329. She also determined that Plaintiff met the disability insured status requirements of the Act and was insured for benefits through December 31, 1998. Tr. 328. Further, the ALJ found the medical evidence to establish that Plaintiff suffered from several severe impairments. See Tr. 334. She concluded, nevertheless, that none of these impairments, either singly or in combination, met or equaled any of the Listing of Impairments.

1. Treating Source Opinions

The regulations require that all medical opinions in a case be considered, section 404.1527(b), but treating source[8] opinions are accorded special status, see section 404.1527(d)(2). "[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); see also section 404.1527. But although a treating source may offer an opinion as to a claimant's RFC, the final responsibility for deciding this issue is reserved to the Commissioner, and no special significance will be given to the source of such opinion. Section 404.1527(e)(2),(3).

---

[8] Section 404.1502 defines a "treating source" as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."

8

Plaintiff complains that the ALJ failed to properly analyze the opinion of her treating psychiatrist, Dr. Kenneth Headen, according to the regulations, or to present evidence which conflicted with such opinion. Plaintiff's treatment records establish that Dr. Headen saw her approximately every three months from October 2000 through August 2001. In January 2002, Dr. Headen wrote a letter that Plaintiff had been treated for three years, and *could not work as a housekeeper* due to "repeated anxiety attacks and severe somatic features." Tr. 205; <u>see also</u> Tr. 333. The doctor added that Plaintiff had received some relief with medications, but had not returned to her prior level of functioning.

Plaintiff alleges that the ALJ failed to *properly* analyze Dr. Headen's opinion, but the ALJ failed to analyze Dr. Headen's opinion *at all*. SSA fact finders are required to analyze only "medical opinions," i.e., opinions "about the nature and severity of an individual's impairment(s)." SSR 96-2p, 61 Fed. Reg. at 34490. Dr. Headen wrote that Plaintiff had been treated for "chronic anxiety disorder with marked somatic features," Tr. 205, but the ALJ found that Plaintiff suffered from severe impairments that included anxiety related disorder and somatoform disorder, Tr. 334. Dr. Headen's opinion indicated that Plaintiff's impairments would prevent her from returning to her *past work* as a housekeeper, and although she had experienced some improvement, she had not returned to her prior level of

9

functioning.  The ALJ agreed that Plaintiff could not perform her "past relevant work,"[9] but only explained that it was due to her "non-exertional limitations."  Tr. 340.

In not addressing Dr. Headen's opinion, however, the ALJ failed to acknowledge the effects of Plaintiff's "marked" and "severe somatic features." Tr. 205.  This lapse, in turn, affected the ALJ's other findings, particularly that Plaintiff's allegations were "not fully credible or consistent with the evidence as a whole."  Tr. 340.  <u>See</u> discussion at Issue 4, <u>infra</u>.  Accordingly, Plaintiff has demonstrated that she suffered prejudice from the ALJ's oversight.  <u>Cf.</u> <u>Morris v. Bowen</u>, 864 F.2d 333, 335 (5th Cir. 1988) ("'This court will not vacate a judgment unless the substantial rights of a party have been affected.'") (quoting <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir.1988)).

2.  Consulting Expert Opinion

In Ruling 96-6p, 61 Fed. Reg. 34466-01, SSA instructs its fact finders in their consideration of findings by "State agency medical and psychological consultants and other program physicians and psychologists."  <u>Id.</u> at 34467.  Citing section 404.1527(f), the Ruling provides that such findings of fact  become opinions at the ALJ and Appeals Council levels, and that these opinions must be evaluated. Although the fact finders are not thereby bound, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions."  <u>Id.</u>

---

[9]  Because Plaintiff testified that she worked as a housekeeper for less than two weeks, Tr. 839, this job did not meet the qualifications of "past relevant work" as defined in the regulations, <u>see</u> section 404.1560(b)(1).

Walter Heiney, Jr., Ph.D., examined Plaintiff on July 24, 2003, on behalf of the state Disability Determination Services. Tr. 668-71. From their conversation, Dr. Heiney concluded that Plaintiff was not consistent in attending to her activities of daily living ("ADLs"); was quite anxious and depressed; and apparently continued to occasionally abuse alcohol. Tr. 671. He decided that Plaintiff

> is not able to respond to directions and perform routine repetitive tasks, with much consistency or facility, and displayed poor sustained concentration and memory abilities. *She would not appear to have sufficient emotional and cognitive facility to handle the requirements of an ordinary work environment.* Socially, she is apt to be somewhat dysregulated, dependent and impulsive.

Id. (emphasis added). Thus, Dr. Heiney describes an individual who fails to meet the Act's "[w]ork-related mental activities generally required by competitive, remunerative work," namely "the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p, 61 Fed. Reg. 34474-01, 344478; see also section 404.1545(c).

After quoting Dr. Heiney's findings, the ALJ first correctly decided that the doctor's opinion was not due "controlling weight" as he had seen Plaintiff only once and, thus, was not a treating source, in accord with Ruling 96-2p. Tr. 335; see SSR 96-2p, 61 Fed. Reg. at 34490 (stating that opinions from sources other than "treating sources" can never be entitled to "controlling weight"). The ALJ further explained

11

that Dr. Heiney's opinion was "inconsistent with the other substantial evidence of record including the treatment notes from the mental health center," Tr. 335, and proceeded to cite to a single treatment note, which predated the letter by over a year, see Tr. 659. Yet in the paragraph immediately preceding that introducing Dr. Heiney's opinion, the ALJ more thoroughly discussed Plaintiff's treatment:

> Records from mental health for period May 21, 2002 to December 18, 2003, note as of June 10, 2002, the claimant was benefiting [sic] from Prozac and therapy. She saw positive results with Prozac and was pleasant and cooperative. Her judgment had improved; she was goal directed and future focused. She had decrease in panic symptoms. On July 25, 2002, she reported continued depressed mood, but had severe financial stressors and family stressors, but she showed no psychotic thinking, had good eye contact, normal speech, was pleasant and cooperative. However, on September 13, 2002, she was significantly depressed with crying spells, sadness, difficulty sleeping and feeling overwhelmed. She described little appetite and not bathing frequently (go without for 4 days). She appeared disheveled with a mild body odor and noted difficulty with memory and concentration. Her diagnoses as of December 4, 2002 were [post traumatic stress disorder ("PTSD")]; panic disorder without agoraphobia and personality disorder, [not otherwise specified], with global assessment of functioning of 50.[10] As of January 29, 2003, her global assessment of functioning was estimated at only 45 (Exhibit B-12F).

---

[10]  A Global Assessment of Functioning ("GAF") score represents a clinician's judgment of an individual's overall level of functioning. American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000) [hereinafter, the "DSM-IV"]. The GAF scale considers psychological, social and occupational functioning of mental health on a scale of 0-100. Id. at 33-34. The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms. A score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. at 34.

12

Tr. 333 (footnote added).

As Plaintiff points out, the regulations note that "[t]he symptoms and signs [of a mental impairment] may be intermittent or continuous depending on the nature of the disorder." 20 C.F.R. Pt. 404, Subpt. P, App. 1 [hereinafter cited as "The Listings"], § 12.00B. The regulations specifically provide for this possibility in stating:

> We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and *on a sustained basis*. Thus, we will consider such factors as the quality and level of your overall functional performance, *any episodic limitations*, the amount of supervision or assistance you require, and the settings in which you are able to function.

Section 404.1520a(c)(2) (emphases added). <u>See also</u> section 404.1545(c) ("When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your [RFC] for work activity *on a regular and continuing basis.*" (emphasis added)). As further explained by the Eighth Circuit Court of Appeals,

> Given the unpredictable course of mental illness, "[s]ymptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." <u>Andler v. Chater</u>, 100 F.3d 1389, 1393 (8th Cir. 1996). Moreover, "[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E) (1999). "Such individuals may be much more impaired for work than their signs and symptoms would indicate." <u>Id.</u>

<u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001).

13

"Symptom-free intervals" are an issue because a claimant, in order to be found not disabled, must be able to work on a "sustained" basis; the Fourth Circuit, along with others, has "imposed a durational requirement on the concept of [SGA]." Gatliff v. Commissioner, 172 F.3d 690, 694 (9th Cir. 1999) (citing, e.g., Wilson v. Richardson, 455 F.2d 304, 307 (4th Cir. 1972) (finding that claimant's holding 11 jobs in 3 years "may demonstrate not his ability, but his inability to engage in [SGA]")). See also Cornett v. Califano, 590 F.2d 91, 94 (4th Cir. 1978) (defining SGA as the "'performance of substantial services with reasonable regularity in some competitive employment or self-employment'" (citation omitted)). Cf. Totten v. Califano, 624 F.2d 10, 11-12 (4th Cir. 1980) ("The 'continuous period' language of § 423(d)(1)(A) does not require a claimant to show an inability to engage in any [SGA] every day of his existence.").

Further, in her review of a claimant's application, an SSA fact finder is not allowed to parse the records for only such information that detracts therefrom. See, e.g., Reefer v. Barnhart, 326 F.3d 376, 381 (3d Cir. 2003) ("Having seen these complaints in the medical record, the ALJ was not at liberty to ignore them."). See also King v. Califano, 615 F.2d 1018, 1020 (4th Cir. 1980) (an ALJ may not reject medical evidence for no reason or for the wrong reason). Thus, in addition to the ALJ's summarization of Plaintiff's mental health records, a more comprehensive review of the transcript, together with a consideration of her treating psychologist's

14

opinion, demonstrates that Dr. Heiney's opinion is not "inconsistent with the other substantial evidence of record," as decided by the ALJ.

The ALJ, however, provided additional reasoning for her rejection of Dr. Heiney's opinion:

> Dr. Heiney's conclusions appear to be based primarily on subjective allegations rather than objective medical findings and even though the claimant exhibited some memory and concentration problems, the evidence does not substantiate that they are severe enough to preclude the performance of simple routine, repetitive tasks or that [Plaintiff's] emotional problems and cognitive deficits would preclude the performance of work in an ordinary work environment.

Tr. 336. Yet Dr. Heiney's conclusion, quoted above, belies this assessment.

Plaintiff's records do not simply reflect her subjective reports of "symptoms"; rather, they also contain "signs." The regulations require the ALJ to consider all symptoms, "and the extent to which symptoms can reasonably be accepted as consistent with the objective medical evidence," defined as "medical signs and laboratory findings." Section 404.1529. A "symptom" is the claimant's own description of a physical or mental impairment. Section 404.1528(a). "Signs," on the other hand, are anatomical, physiological, or psychological abnormalities which can be observed apart from symptoms, and must be shown by medically acceptable clinical diagnostic techniques. Section 404.1528(b). *Psychiatric* signs are specifically defined as "medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception." Section 404.1528(c).

15

The Listings provide that a psychiatric opinion may rest either on observed signs and symptoms or on psychological tests. The Listings, § 12.00B. Dr. Heiney's report utilized all three. The doctor's mental status examination revealed that Plaintiff's mood was nervous and somewhat dysthymic, although friendly. Tr. 669. Plaintiff's affect was anxious and depressed. Dr. Heiney's testing revealed that Plaintiff's immediate and recent memory was only fair, and her common sense reasoning and judgment were poor. Tr. 670. In addition, her current cognitive abilities were reduced by emotional and educational factors. Tr. 671.

Because the doctor's opinion rested on the use of diagnostic techniques accepted by the regulations, the ALJ erred in equating that technique to mere acceptance of Plaintiff's statements. The Act requires only that the claimant's symptoms be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 423(d)(5a). "Objective medical facts and the opinions and diagnoses of the treating and examining doctors constitute a major part of the proof to be considered in a disability case and may not be discounted by the ALJ." McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). As the ALJ posited no error with either Dr. Heiney's interview or examination, there was no reason to reject his conclusion or to assume that he relied solely on Plaintiff's statements rather than making an objective evaluation.

16

Last of all, the ALJ proposed that Plaintiff would be precluded from "managing benefits in her own best interest" only by her alcohol abuse,[11] and that Dr. Heiney apparently did not consider this factor in forming his opinions.[12] Tr. 336. But although Plaintiff denied that she had any problem with alcohol and last drank three weeks previously, Tr. 669, Dr. Heiney concluded that she "apparently continues occasionally to abuse alcohol," and he recommended that she consider a twelve-step program, Tr. 671.

SSA deems its consultants "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, 61 Fed. Reg. 34466-01, 34467. On SSA's behalf, these consultants consider the medical evidence in disability cases and make findings of fact on the medical issues, including the claimant's RFC. It is because these consultants are experts in SSA disability programs that the fact finders must consider and evaluate their opinions in making a decision. See also "Federal Old-Age, Survivors, and Disability Insurance and Supplemental Security Income for the Aged, Blind, and Disabled; Evaluating Opinion Evidence," 65 Fed. Reg. 11866, 11871 ("These requirements are based on the medical or psychological consultants' experience as

[11]   The court assumes that this is what the ALJ alluded to in saying, "The only thing that would preclude her *from doing so*," as the last action to which he referred was Plaintiff's managing benefits. Tr. 355 (emphasis added).

[12]   Interestingly, the ALJ found that Plaintiff's alcohol abuse was not a contributing factor material to her determination of disability. Tr. 339 (citing Public Law 104-121; see also section 404.1535).

health care professionals who are also experts in the evaluation of the medical issues in disability claims under the Act and recognize that we weigh medical opinions included in case records.").

Hence, the court finds it disingenuous that the ALJ here might so cavalierly dismiss the opinion of the SSA consultant, especially as she has not shown, by substantial evidence, that his opinion is contrary to the evidence of record. As explained by a sister court in a similar scenario:

> While the ALJ is entitled to make credibility determinations, the ALJ may not substitute his judgment for the judgments of experts in their field of expertise.
>
> Clinical psychologists deal with quintessentially subjective information with respect to which they must exercise professional, interpretive judgment. . . . "[The ALJ's] remarkable conclusion is made possible only by the ALJ's tacit equation of the [psychologist's] findings with plaintiff's subjective complaints, as if the former merely parroted the latter without any medical judgment/assessment intervening. This unstated assumption is unwarranted as a professional medical matter and unsupported by any unique facts specific to this case."

Matthews v. Barnhart, 347 F. Supp. 2d 1093, 1101 (M.D. Ala. 2003) (citations omitted). See also Grimmett v. Heckler, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) ("In the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional." ).

Finally, Dr. Heiney's opinion is supported by those of the other experts engaged by SSA. The *physical* consultative examiner, Dr. Ernest Eason, concluded

that Plaintiff's "main problem is poor control, poor insight into the nature of her problem, and major depressive disorder. . . . Consequently, she has a lot of somatic complaints mostly related to smoking, depression, etc. She has poor insight into the nature of her illnesses." Tr. 676. SSA expert, W. Henry Perkins, Ph.D., found that Plaintiff was "markedly limited" in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."[13] Tr. 685. His findings were affirmed at a later date by a separate agency expert. Tr. 678, 680.

Accordingly, Plaintiff here has established that the ALJ committed an error of law in disregarding the consultant's opinion. As a result, the ALJ's RFC finding that Plaintiff can perform simple, routine, repetitive tasks ("SRRTs") is undermined.[14]

3. Hypotheticals

Prejudice to Plaintiff from the ALJ's error in evaluating the doctors' opinions manifested at the hearing. Once the claimant reaches step five of the sequential evaluation, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). The purpose of bringing in a VE is to

---

[13] Dr. Perkins found Plaintiff to be disabled *with* her substance abuse, see Tr. 686, but the ALJ failed to address this opinion, also, see Tr. 340.

[14] The Commissioner concedes that, if found unable to sustain SRRTs, "[P]laintiff would be disabled." Def.'s Br. at 14.

assist the ALJ in meeting this requirement.  Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted).  For a VE's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments.  Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006) (quoting Walker, 889 F.3d at 50-51); see also English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993). An ALJ has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts.  See Swaim v. Califano, 599 F.2d 1309, 1312 (4th Cir. 1979).  See also Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) ("[F]or a [VE]'s opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." (quoting Walker, 889 F.2d at 50)).  But the hypothetical posed to the VE need only reflect those impairments supported by the record.  See Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Barnett v. Apfel, 231 F.3d 687, 690 (10th Cir. 2000); Cass v. Shalala, 8 F.3d 552, 556 (7th Cir. 1993).

Because the ALJ failed to adopt the medical opinions on Plaintiff's mental limitations,[15] the ALJ's hypothetical claimant was only limited to SRRTs and was

---

[15]  Defendant asserts that "[t]he ALJ based her assessment on the evidence from the state agency reviewers in the consolidated claims," which assessment "is also consistent (continued...)

20

"unable to work at a production rate involving piecework, and the individual needs to avoid intense, ongoing interpersonal interaction with others."  Tr. 844.  Such a description, of course, runs counter to Dr. Heiney's assessment of Plaintiff as unable to perform routine, repetitive tasks "with much consistency or facility."  Tr. 671.

In response, the VE testified that there were several jobs that a claimant, so mentally limited, would be able to perform.  Tr. 844-45.  But when questioned as to an individual who could not sustain (I) SRRTs, (ii) "a minimal level of concentration," or (iii) "consistency of pace throughout the day," the VE answered that there would be no jobs.  Tr. 845-46.  Consequently, if the ALJ had adopted specifically Dr. Heiney's findings, the VE would not have been able to respond with jobs that Plaintiff would have been able to perform.

4. Credibility

Plaintiff complains that the ALJ erred in her assessment of Plaintiff's credibility.  "The ALJ is required to make credibility determinations . . . about allegations of pain or other nonexertional disabilities.  . . .  [S]uch decisions should refer specifically to the evidence informing the ALJ's conclusion."  Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985) (citation omitted).  Under Craig, 76 F.3d at 591-96, subjective

---

[15]  (...continued)
with the findings of a state agency reviewer in the initial claim," citing page 340 of the transcript.  Def.'s Br. at 12.  The court notes, however, that as to such "evidence," the ALJ said only that she "does not feel that the claimant is capable of performing medium level work."  Tr. 340.  The ALJ made no mention of *any* reviewers' findings on Plaintiff's mental capacity.  And the court reminds Defendant that he requested remand of the ALJ's initial decision, in part, for reconsideration of state agency evidence of Plaintiff's mental impairments.  See Def.'s Rem. Mot. (Pldg. #6).

complaints are evaluated in two steps. First, there must be documentation by objective medical evidence of the presence of an underlying impairment that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Not until such underlying impairment is deemed established does the fact finder proceed to the second step: consideration of the entire record, including objective and subjective evidence, to assess the credibility of the severity of the subjective complaints. See also section 404.1529(b); Ruling 96-7p, 61 Fed. Reg. 34483-01, 34484-85. Importantly, in determining the individual's credibility, the ALJ "must consider the entire case record" and may not disregard the individual's statements about the intensity and persistence of her pain "solely because they are not substantiated by objective medical evidence." Id.

The ALJ found that Plaintiff did *not* "have a medically determinable impairment which reasonably could be expected to produce the actual subjective symptoms in the amount and degree" which Plaintiff alleged. Tr. 336. Nevertheless, the ALJ went on to evaluate Plaintiff's credibility in accordance with the second step of Craig. Ruling 96-7p advises the adjudicator to consider, in addition to the objective medical evidence, the following factors: the claimant's individual activities; the location, duration, frequency, and intensity of her pain or other symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication; non-drug treatment that the claimant has received for relief of symptoms; any measures other than treatment the claimant has used to

22

relieve symptoms; and any other factors concerning the claimant's limitations and restrictions due to her symptoms. 61 Fed. Reg. at 34485 (citing section 404.1529(c)(4)). The fact finder is also advised to consider medical signs and laboratory findings; medical opinions provided by medical sources; and statements about the claimant's symptoms and their effect on the claimant's ability to work. Id. at 34486.

On review, this court is not authorized to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, the issue before the court is not whether Plaintiff "is disabled, but whether the ALJ's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589.

The court finds that the ALJ's credibility finding cannot be supported by substantial evidence as she essentially ignored Plaintiff's diagnosis of somatoform[16] disorder, defined in Stedman's Medical Dictionary (28th ed. 2006), as

> [A] group of disorders in which physical symptoms suggesting physical disorders *for which there are no demonstrable organic findings or known physiologic mechanisms*, and for which there is positive evidence, or a strong presumption that the symptoms are linked to psychological factors; e.g., hysteria, conversion disorder,

---

[16] "Somatic" refers to the body in general. Stedman's Medical Dictionary 1788 (28th ed. 2006) [hereinafter, "Stedman's"].

23

> hypochondriasis, pain disorder, somatization[17] disorder, body
> dysmorphic disorder, and Briquet syndrome.

Id. at 571 (emphasis, footnote added). Dr. Headen so diagnosed Plaintiff as early as October 31, 2001, and the observation repeatedly appears in Plaintiff's records. See, e.g., Tr. 141, 144, 149, 153, 283. This diagnosis explains why Plaintiff's *physical* complaints were so much more severe than would be explained by her "medically determinable impairments" and, thus, why she failed to meet the first prong of the Craig analysis. See Bragg v. Commissioner, 567 F. Supp. 2d 893, 913-14 (N.D. Tex. 2008). Even so, Plaintiff told the ALJ that her largest impediments to working were not her physical maladies but, rather, her anxiety, then her depression, followed by her difficulty breathing.[18] Tr. 842.

The court commends the ALJ for conducting a lengthy, and thorough, assessment, yet just a few examples will show how she erred. The ALJ noted the observation of Plaintiff's therapist that she walked with a limp, "gingerly," Tr. 141, leading the ALJ to speculate, "suggesting some exaggeration of her symptoms,"

---

[17] Somatization: "The process by which psychological needs are expressed in physical symptoms[.]" Stedman's at 1788. Although somatization can result from "a wish for material gain associated with a legal action following an injury," it could also occur, inter alia, as "the expression or conversion into physical symptoms of anxiety, or . . . a related psychological need." Id.

[18] The ALJ disputed this testimony, claiming that "during mental health sessions [Plaintiff] had a lot of somatic complaints suggesting she felt that her physical problems were her primary problems." Tr. 339. But Dr. Eason, the physical consultative examiner, explained that Plaintiff's "main problem is poor control, poor insight into the nature of her problem, and major depressive disorder. . . . *Consequently, she has a lot of somatic complaints* mostly related to smoking, depression, etc. She has poor insight into the nature of her illnesses." Tr. 676 (emphasis added).

Tr. 338. Yet, as pointed out by Plaintiff, the actual medical record fails to support the ALJ's observation. Plaintiff told the caregiver, social worker Carolyn Lee, that she continued to have nightmares about her abusive husband. Tr. 141. Ms. Lee wrote that Plaintiff indicated an exacerbation of depressive symptoms due to her inability to work. The therapist noted that Plaintiff continued to be "quite somatic," and her mood and affect were more depressed. Id. Ms. Lee listed among Plaintiff's diagnoses somatoform disorder.

The ALJ recalled Plaintiff's testimony that she would have "flashbacks," Tr. 338, but such events are not atypical with PTSD,[19] another diagnosis that Plaintiff carried throughout her records. See, e.g., Tr. 713 (reports panic, PTSD symptoms). The ALJ wrote that Plaintiff's "panic attacks" did "not appear to be ongoing,"[20] Tr. 338, but in the year preceding the hearing, there were several reports of such symptoms, see, e.g., Tr. 713 (Plaintiff reported panic and PTSD symptoms); 732 (noting Plaintiff's recent increase in "anxiety" symptoms); 737 (advising Plaintiff to "practice deep breathing techniques when she begins to feel the 'fluttering'"); 815 (Plaintiff reported having had a panic attack).

---

[19]   The DSM-IV describes the criteria for PTSD as "persistently reexperiencing distressing dreams of the event with disassociative flashback episodes and intense psychological distress when exposed to internal or external cues that symbolize the traumatic event. These experiences result in intense fear, helplessness or horror."

[20]   The ALJ "opined" that Plaintiff's attacks "appear to be due to the stress of an abusive third marriage and the fact the claimant's husband is incarcerated and she is afraid he will get out of jail and assault her," Tr. 338, but the court fails to see how this "theory" would impact Plaintiff's credibility.

25

The ALJ added that Plaintiff's symptoms had improved with treatment and medication, Tr. 338, and the court allows that if symptoms are, or can be, reasonably controlled by medication, they may not be considered disabling under the Act. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Yet in Plaintiff's last records, she told her psychiatrist, Dr. David Ward, that she had both good and bad days, and increasingly, did not want to leave the house. Tr. 718. At a separate appointment, she complained of panic and PTSD symptoms. Tr. 713. Dr. Ward found Plaintiff to continue with decreased insight and increased stress. At Plaintiff's last visit, her therapist noted that, although Plaintiff was making progress, she continued to isolate, spending most of her time in her bedroom. Tr. 812.

The ALJ stated that Plaintiff appeared "to be coping fairly well" with various stressors in her life, "as long as she adheres to her medication regimen, therapy and refrains from using alcohol." Tr. 338. She proffered support for this conclusion in the June 10, 2002, record of Plaintiff's session with her therapist, Ms. Lee. See Tr. 659; see also page 12, supra.

At her very next visit with Ms. Lee, however, Plaintiff reported isolating, crying spells, anhedonia, and feelings of helplessness and hopelessness. Tr. 658. She worried constantly, and complained of more panic attacks and difficulty with her memory and concentration. Ms. Lee observed that Plaintiff's mood was depressed and anxious. Yet Plaintiff was medication-compliant, regularly attending mental health sessions, and not using alcohol. Ms. Lee concluded that Plaintiff had, inter

26

alia, PTSD, chronic, with reports of nightmares and an increase in anxiety symptoms, and alcohol abuse in full sustained remission.

The following month, Dr. Ward noted that Plaintiff was not drinking, but had recently increased depression and worry, with increased symptoms. Tr. 657. At her next session with Ms. Lee, some two and one-half weeks later, Plaintiff's symptoms were arguably even worse, although she continued to be compliant with her medications and therapy, and her alcohol abuse was "in full sustained remission." Tr. 656. Again, the ALJ's observation is not supported by the record.

The ALJ focused on Plaintiff's November 22, 2004, global assessment of functioning ("GAF") of forty-five, explaining that "she had minimal visits to the mental health center for treatment," and thus determining that this GAF "does not appear to be valid." Tr. 338 (citing Tr. 816). Yet when Plaintiff's GAF was assessed at 50[21] in December 2002, it was with "service dependency"; she had been regularly seeking mental health treatment. Tr. 652. Further, this score was lower than when Plaintiff began regular treatment in October 2000. See Tr. 156. In January 2003, her therapist again dropped Plaintiff's GAF to only 45. Tr. 647.

Moreover, contrary to the ALJ's characterization, Plaintiff had been in regular treatment with therapist Michelle Turner by November 2004. Ms. Turner first saw Plaintiff on August 14, 2004. See Tr. 625. Plaintiff's visits to the mental health facility were sporadic for a period thereafter, with the records showing a number of

---

[21] See note 10, supra.

cancellations, but not all attributable to Plaintiff.  See, e.g., Tr. 623, 624, 743, 746. After seeing Dr. Ward in October 2003, Plaintiff resumed her mental health treatment in January 2004 with a visit to Ms. Turner.  Prior to the November 2004 GAF, Plaintiff attended mental health sessions in February, March, April, May (two), June, July (two), August, September, and October.  See Tr. 719, 720, 723, 726, 729, 732, 737, 738, 739, 742, 744.  During this period, Dr. Ward generally scheduled Plaintiff at six-week to two-month intervals, and Ms. Turner advised that Plaintiff needed individual therapy only once per month.  Tr. 722.

To the extent that the Commissioner may attempt to rely solely on Plaintiff's relatively mild objective findings, this he cannot do at Craig's step two.  See Craig, 76 F.3d at 595 ("[A] claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity[.]").  See also SSR 96-7p, 61 Fed. Reg. at 34487 (the ALJ may not disregard the individual's statements about the intensity and persistence of her symptoms "solely because they are not substantiated by objective medical evidence").  The court believes that it need go no further before concluding that the ALJ's credibility finding is not supported by substantial evidence.

5.  RFC

As noted already, the ALJ's decision to dismiss Dr. Heiney's opinion undermines her RFC decision.

28

6.  The Listings

Plaintiff argues that the ALJ failed to properly consider whether she met or equaled a mental health listing.  The "Listings," found at 20 C.F.R. Part 404, Subpart P, Appendix 1 (part A), are "a catalog of various disabilities, which are defined by 'specific medical signs, symptoms, or laboratory test results.'"  Bennett v. Sullivan, 917 F.2d 157, 160 (4th Cir. 1990) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)).  When a claimant satisfies a Listing by meeting all its specified medical criteria, she presumably qualifies for benefits.  See id.

In performing the Listings analysis, the ALJ found that Plaintiff suffered from severe impairments listed in five of the nine diagnostic categories grouped under Listing 12.00, "Mental Disorders."  See Tr. 334.   The ALJ decided that Plaintiff's borderline intellectual functioning did not meet the requirements of Listing 12.05C (mental retardation) because Plaintiff's IQ exceeded seventy, see The Listings, § 12.05C; Plaintiff does not appear to challenge this finding.

The other relevant categories (Listings 12.04, 12.06, 12.07, and 12.08) consist first of a descriptive passage, and then a set of medical findings (paragraph A criteria), one of which must be met.  See The Listings, § 12.00A.  If this criterion is met, there follows a test of functional limitations (paragraph B criteria), *two* of which must be met.  There is an additional functional criterion (paragraph C criteria) in Listings 12.04 and 12.06, which will be assessed only if the paragraph B criteria are not satisfied.

29

The ALJ did not discuss Plaintiff's meeting of the paragraph A criteria, but moved on to the B criteria, concluding that Plaintiff's mental disorders "do not cause any marked or extreme limitations of functioning in any domain." Tr. 334. Specifically, the ALJ found that Plaintiff's records revealed evidence only of:

(1) moderate restriction in ADLs;

(2) moderate difficulties in maintaining social functioning;

(3) moderate difficulties in maintaining concentration, persistence, or pace; and

(4) no evidence of decompensation.

Tr. 334-35.

Plaintiff counters that Dr. Headen opined that she had chronic anxiety disorder with "marked" somatic features, Tr. 205, yet the doctor did not opine as to how such features may have impacted the B criteria, nor does Plaintiff make any such suggestion. She also refers to Dr. Headen's statement that, "[i]nstrumental in her *decompensated*[22] state is the fact of her involvement with an extremely physically

---

[22]   The Regulations define "episodes of decompensation" as:

[E]xacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations,

(continued...)

Case 1:03-cv-01198-NCT-WWD   Document 23   Filed 06/01/09   Page 30 of 38

and emotionally abusive relationship[.]" <u>Id.</u> (emphasis, footnote added). Therefore, the ALJ erred in finding there was *no* evidence of decompensation, Tr. 335, and she cannot rely on the state agency experts to support this determination, <u>see</u> Tr. 217 ("Insufficient Evidence"); 245 (same); 698 (no opinion). And to the extent that the ALJ decided not to adopt the opinion of the treating psychiatrist, she was under an obligation to explain why. <u>See</u> section 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). As discussed hereinabove, the ALJ failed to address Dr. Headen's letter at all.

Plaintiff further points to Dr. Heiney's opinion that she:

• "displayed poor sustained concentration and memory abilities";

• "would not appear to have sufficient emotions and cognitive facility to handle the requirements of an ordinary work environment";

• socially, "is apt to be somewhat dysregulated, dependent and impulsive."

Tr. 671. Plaintiff is correct that the ALJ erred in dismissing Dr. Heiney's opinion and improperly discounted the doctor's testing and evaluation results.

---

[22] (...continued)
placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The Listings, § 12.00C(4).

31

The ALJ supported her finding that Plaintiff was only moderately restricted in her ADLs in that Plaintiff watched television four to five hours per day; talked on the phone with her mother and sisters; cooked "a TV dinner or fix[ed] a sandwich"; and took naps during the day. Tr. 334. Yet the regulations ask for more than this, defining ADLs to include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability." The Listings, 12.00C(1). Not only does the ALJ's list fall far short of the SSA's, the record also shows how far short Plaintiff falls.

Plaintiff's live-in boyfriend discussed her ADLs in an agency questionnaire. She indeed spent her days just watching television and talking on the phone. Tr. 484. Plaintiff left home only for doctor's appointments, as she did not like crowds or leaving the house. Tr. 485-86. She lacked interest in her appearance and even in basic hygiene. Tr. 486. In a "Function Report," the boyfriend added that he sometimes asked Plaintiff "to take [a] bath [and] clean self up because she has no desire to do it." Tr. 490. Plaintiff prepared only sandwiches and frozen entrees; he did most of the cooking. Id. Plaintiff's ADLs questionnaire was consistent, adding that she had no interest in taking care of her body, sometimes going three weeks without a bath; only microwaved; had no hobbies or interest in anything; did not want

32

to go anywhere; engaged in no activities; and "can't deal with anything anymore." Tr. 501-02.

In addressing "social functioning," SSA focuses on, <u>inter alia</u>, social isolation, a theme that reappears in Plaintiff's therapy notes. <u>See, e.g.</u>, Tr. 156, 277, 812. The Listings explain that strength in social functioning may be exhibited by the claimant's ability "to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities." The Listings, § 12.00C(2). There is little, if any, evidence of Plaintiff having these abilities in the ALJ's reliance on Plaintiff's relationship with her family and her boyfriend, and that she was "cooperative and friendly during most mental health and other evaluations." Tr. 335.

The ALJ's assessment of Plaintiff's ability to concentrate, however, is most clearly unsupported. She relied on Plaintiff's ability, when tested by Dr. Heiney, "to remember 5 digits forward and 4 backward and 3/5 objects after 5 minutes," Tr. 335, but again, the regulations require more. "On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits." The Listings, § 12.00C(3).

33

Dr. Heiney found that Plaintiff could complete rudimentary calculations, but that she was unable to perform serial sevens and, further that "[s]he was unable to do any of the more complex story problems." Tr. 670. Moreover, Dr. E. J. Burgess, one of the agency experts that reviewed Plaintiff's file, opined that she did indeed suffer from "marked" difficulties in maintaining concentration, persistence, or pace. Tr. 217. Dr. Perkins failed to opine as to the B criteria, but he concluded that Plaintiff was "markedly limited" in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Tr. 685; see also The Listings, § 12.00C(3) ("[W]e may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without an unreasonable number and length of rest periods, or without undue interruptions or distractions."). Dr. R. Warren subsequently agreed with his assessments. Tr. 678, 680.

Yet overall, Plaintiff has not established that the ALJ erred in finding that she did not meet any of the mental health listings. Dr. Heiney, presumably versed in Social Security terminology, failed to clearly indicate that Plaintiff's limitations in the B criteria, other than concentration, were disabling. The state agency experts opined that only Plaintiff's ability to concentrate was markedly impaired. As Plaintiff has demonstrated only one of the two B criteria, she cannot meet Listing 12.08.

Listings 12.04 and 12.06, however, include "C" criteria as an alternative to the two "B" criteria. The C criterion for Listing 12.06 is the "complete inability to function independently outside the area of one's home"; Plaintiff has not indicated that she can rely on this factor, nor does the record so indicate.

As to the Listing 12.04 C criteria, Plaintiff has indicated only that the first subsection would apply: "Repeated episodes of decompensation, each of extended duration." But the Listings specifically define this term to mean "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." The Listings, § 12.00C(4). Although Plaintiff's records show that her condition fails to meet this definition, the Listings offer her another alternative: "If you have experienced . . . less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a *determination of equivalence*." Id. (emphasis added).

A finding that a claimant's impairment does not *meet* a listed impairment does not end the inquiry. Rather, a claimant may establish equivalency by demonstrating "that his 'specific medical signs, symptoms, or laboratory test results' equal those for a disability that happens to be listed." Bennett, 917 F.2d at 160 (quoting Zebley, 493 U.S. at 530). If a claimant has more than one impairment, the combined effect of the impairments will be considered. See id. In making the determination of medical

35

equivalence, the Commissioner will consider the opinions of medical or psychological consultants.  Id.

Plaintiff has provided medical evidence of an "episode of decompensation," contrary to the finding of the ALJ.  Because a finding of equivalence is presumptive as to disability, the Commissioner requires it to be made by one familiar "with the regulations and the legal standard of severity set forth in [Sections 404.1525(a) and 404.1526]" – namely, the Commissioner.  SSR 96-5p, 61 Fed. Reg. 34471-01, 34473.  Further, the ALJ is to consider the opinions of the state agency consultants on the issue. See section 404.1526(d).  And when state agency doctors find that an impairment does not equal a Listing, the ALJ may properly rely on their opinions. Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004).  In Plaintiff's case, *none* of the state agency experts opined that Plaintiff equaled a mental Listing. See Tr. 207, 234, 688.  Accordingly, the ALJ's equivalence finding is supported by substantial evidence.

Plaintiff's initial application for benefits has been pending since December 1, 2000.  Her claims have already been heard by two ALJs and twice denied.  The Commissioner requested remand for further action on two of the same issues which the court now finds to be problematic.  After seven years, Plaintiff still has no resolution of her claim.  This represents a significant period of time.  "People generally do not seek Social Security disability benefits . . . because they want to subsidize an already comfortable existence.  In many cases, they seek benefits

36

because they have nowhere else to turn." <u>Schoofield v. Barnhart</u>, 220 F. Supp. 2d 512, 524 (D. Md. 2002).

Where no useful purpose would be served by a remand and, in fact, justice would not be served by such an outcome, outright reversal is justified. <u>See</u> <u>Coffman v. Bowen</u>, 829 F.2d 514, 519 (4th Cir. 1987). The facts of this case justify such a reversal and award. Two administrative decisions have failed to muster substantial evidence to support a denial. The continued presence of legal errors in the consideration of this matter after over seven years of administrative and legal processes makes it clear that remand would serve no useful purpose. Plaintiff, therefore, is entitled to the benefits she seeks.

## Conclusion and Recommendation

For the foregoing reasons, the decision of the Commissioner is not supported by substantial evidence, the correct legal principles were not applied, and substantial evidence demonstrates that Plaintiff is disabled. Therefore, **IT IS RECOMMENDED** that the Commissioner's decision finding no disability be **REVERSED** and that the matter be **REMANDED** to the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3) to take appropriate action regarding an award of benefits to Plaintiff based on the disability alleged to have commenced on May 10, 1994. To this extent, Plaintiff's motion for summary judgment (pleading no. 19) seeking a reversal of the Commissioner's decision should be **GRANTED**. To the extent that Plaintiff's motion

37

seeks an immediate award of benefits, it should be **GRANTED**.  Defendant's motion

for judgment on the pleadings (pleading no. 21) should be **DENIED**.

.

WALLACE W. DIXON
United States Magistrate Judge

June 1, 2009